Good morning again, Your Honors. I'm Michael Weinstein from the Federal Public Defender. Still Michael Weinstein. Still Michael Weinstein, still representing Dean Carter, Your Honors. I realize that this is actually improper protocol, but I just wanted to say something quickly about the Los Angeles appeal. Judge Clifton, you raised the specter of McCoy. I do think that McCoy and Garza, which we saw in our 28-J briefs, might actually affect the analysis of both the irreconcilable conflict claim and the IEC guilt-based claim. And so if the Court is interested, we'd be happy to submit some supplemental briefings. We'll let you know if we desire supplemental briefings. Thank you. Now, turning to Carter's second appeal, like the other appeal, this one contains two certified claims, and the Court has requested supplemental briefing on an additional two. And the two claims I think would benefit most from additional argument is, again, the ineffective assistance of counsel at penalty claim. I'll address some of the arguments that opposing counsel had made in the Los Angeles appeal, but also his Eddings claim, because the errors identified in both sort of compound one another, and when you analyze them together, you see that the jury was really deprived of an accurate, reliable picture of the available mitigation in this case. So I want to highlight two differences about the deficient performance prong in the San Diego case, because I think that, for the most part, the prejudice analysis is going to be very similar. The first thing that's different about the deficient performance here is to recognize that the San Diego lawyers had the unique benefit of watching their penalty phase strategy play out in front of a jury. They were actually at the Los Angeles trial, and they saw how the jury reacted to the mitigation, and they saw the jury reject that mitigation and sentence Carter to death. And yet two years later, they go to San Diego and they replicate that same strategy, apparently hoping for a different result, and they didn't get a different result. They got the same thing, a death sentence for their client. The other thing that's really, really remarkable about their investigation is that they didn't just have the unique benefit of watching their strategy play out, they had the luxury of additional time. They had been on the case since the mid-'80s as well. Carter's Los Angeles trial happened in 1989. The San Diego trial happened in 1991. So they had two additional years to investigate their case. And they saw their strategy fail, and they didn't supplement it with additional mental health evidence, even though they knew that they should. And, in fact, they started conducting the most critical part of that investigation at the 11th hour, six days before the penalty phase began. They had a PET scan conducted on Carter, and that PET scan shows concrete proof of diffuse brain damage that's affecting all different parts of his brain, including, this is very important, the corpus callosum. The corpus callosum, when you see damage to the corpus callosum, that's usually a very strong indicator that someone has suffered from fetal alcohol syndrome. But that brain scan also showed the frontal lobe damage, which I discussed in the last appeal. But they waited too long to get that scan administered. And because of that, they couldn't get their expert lined up in time. The first time that they had this teleconference with their expert was when the penalty phase was already underway. And as a consequence of that, they weren't able to get their expert in court in order to testify. The couple things that came up in the last argument about the fetal alcohol syndrome, I would like to point out that even though the criteria has been evolving since the 1970s, it's remained substantially the same since, I think, 1973 or so. And to remind the Court in Rompilla v. Beard, the Supreme Court chastised trial counsel for failing to investigate fetal alcohol syndrome in a 1988 trial. That was one year before Carter's Los Angeles trial, three years before his San Diego trial. So while it was still an evolving field, it was still evidence that could have been admitted and should have been admitted. The second thing, there is the specter of antisocial personality disorder. As Dr. Brown explains in her declaration, any prior ASPD, antisocial personality disorder, diagnoses would have been easily refuted at the time of trial because ASPD is supposed to explain a continuum of behavior. And in this case, all it does is explain really isolated instances of its behavior. Also, the DSM says ASPD is only a proper diagnosis if a person's behavior cannot be explained by a general medical condition. And one of those general medical conditions is fetal alcohol syndrome. So a properly prepared expert would have been able to cast great doubt, if not completely, undermine any prior ASPD diagnoses. That's why, even though trial counsel said during the teleconference interview that they were worried about opening the door to additional aggravating evidence, presumably the ASPD diagnoses, that was an unreasonable strategy because if they had a proper expert lined up, that expert could have undermined those diagnoses. There were lots of red flags about fetal alcohol syndrome. The first red flag is the fact that they learned, trial counsel learned, that the parents were chronic alcoholics when Carter was a child in a place that is known for its alcoholism, known as Alaska. And then, you know, just a few years before the trial began, you know, the United States Surgeon General had declared fetal alcohol syndrome to be a national emergency. You know, this should have been on their radar. And then, again, if they had gotten the PET scan, they would have been able to consult with an expert who would have said, look, there's a defect in the corpus callosum, and that indicates fetal alcohol syndrome, so we should investigate that. Turning now to the child abuse evidence. So I don't think it's correct to say that there were just a few people that had seen it. There were a lot of people that had saw it. Cheryl Stavish saw it. Von Johnson saw it. Chuck Reeder. Guy Martin. Robert Sherman. Now, I admit it, like some of them, like Robert Sherman, told somebody else about walking into the Carter home and seeing the boys chained to a table and drinking water. So it's hearsay. We acknowledge that. But the Supreme Court has said in Sears v. Upton and Chambers v. Mississippi that you can't rigidly apply evidentiary rules at the penalty phase of a capital trial. In fact, Sears v. Upton, the Supreme Court considered hearsay statements that were made in declarations and then ultimately found that habeas relief was warranted in that case. But, counsel, didn't some evidence of child abuse come in? Only a single incident of the chaining, Your Honor. So there was some evidence at the San Diego case that his parents were abusive in the sense that they would beat their children or they would fight with one another. But there's only one single incident of Carter being chained to a bed, and it was painted as discipline because it was Carter who was the problem, not his parents. But there is a, I think, a constitutionally significant difference between a jury learning about a single incident that's painted as discipline and learning that chaining is occurring widespread, in a widespread and chronic manner. You know, again, this is Carter being chained to tables, to beds, to cabin posts, in Nome, at his summer cabin in Osborne. People see him dancing around, playing with the other kids, shackled at the ankles or handcuffed. That's a very different picture than the one that was painted at the trial. And just like the Los Angeles prosecutor, the San Diego prosecutor pointed this out and said, I think, let me see, I think he said something like, I have the word discipline pointed out there. They're put up here on a board. There's no evidence of abuse here. But there was evidence of abuse that could have been discovered had they followed up the lead on the relevant leads. And, again, the best cases for this, Your Honors, Wiggins v. Smith, and then probably Douglas v. Woodford. Douglas v. Woodford is a case where trial counsel failed to investigate both mental health evidence and social history evidence. And trial counsel in Douglas v. Woodford learned about his client's deprived childhood, presented some evidence of it. But what this Court said is that if you look at what could have been discovered, it indicated that further investigation would have yielded more in mitigation investigation and triggered a duty to dig deeper. Does the Court have any questions about the ineffective assistance of counsel penalty claim? Here's not. Here's not. So I'll move on to the Eddings claim. So the Eddings claim is really based on what is a very well-established rule, which is that a judge may not prevent a jury from considering any aspect of the defendant's character or record that the defendant proffers as a basis for less than death. And here the judge did just that and excluded three pieces of mitigation evidence. The first was Jerry's testimony about the extreme measures that Carter took to try to escape his tumultuous home life. Carter would sneak onto planes that were leaving Nome, Alaska, and go into Anchorage, 500 miles away. One of these planes, he snuck into the Will-Will. And I'll just tether this back to the ineffective assistance of counsel claim. Followed by Jerry's testimony. Did not directly observe. Jerry, it was a lack of personal knowledge, Your Honor. Yes. So Jerry did not personally observe it. Carter would tell him when he came back from one of these escape attempts that he had tried to sneak aboard a plane, but he didn't personally see it. But you had the entire town of Nome that was out and about trying to find Carter because he had escaped or he had run off. All right. But that doesn't mean that he would admit the evidence about the airplane. What was that? You can admit the evidence that he was gone and nobody knew where he was. It doesn't mean that you have to admit the evidence about sneaking into a Will-Will. The trial judge in San Diego excluded that exact evidence, Your Honor. But, again, Sears v. Upton says that even when you have mitigation evidence that's based on hearsay, it doesn't just get excluded right out. You have to relax the rules a little bit. Does Sears say that you must admit it? No. It's up to the discretion of the court. So where's the problem? Where's the right that Carter has to have this admitted? Right. It's Green v. Georgia and Chambers v. Mississippi that says that if a defendant proffers evidence that ordinarily would be excluded under the evidentiary rules, you look to see whether it was relevant to a critical issue. Here it's his life at stake. I think that's pretty easily met and the mitigating evidence is supportive. And we lose the regular rules of admissibility? No, but you're looking to see whether there's sufficient reliability. And what the Supreme Court hasn't really done is explained what it means for something to be sufficiently reliable. Then how do we know that California was wrong if the Supreme Court hasn't adequately explained this? Right. Well, so — I'm really struggling here, counsel, because you've got admitted hearsay. Okay. And the trial court admitted some of it, didn't admit all of it because part of it was hearsay. Those seem to be just the regular rules by which we conduct trials. And so I would need at least I would be very interested in knowing what is the Supreme Court authority clearly established that should have told California that it was dead wrong on excluding hearsay. Yeah. So I would just say that Chambers and Green say it has to be sufficiently reliable. Well, does that say that you have to admit hearsay? It does not. Okay. So then how would California know that the Supreme Court had clearly established that principle? Well, the California Supreme Court knew that the rules were supposed to be relaxed and it applied it in a really rigid fashion here. But if the Court disagrees about Jerry's testimony, I would like then to just focus the Court's attention on Dr. Ilana's testimony, because I think that's actually the really critical aspect of the Eddings claim. And just to remind the Court, this aspect of the Eddings claim, not all of it's reviewed under 2254d, because the California Supreme Court didn't adjudicate whether there was error here. It actually said it was a really close call, but just went to prejudice. And we can get to prejudice in a little bit. And I forgot to mention at the beginning, I would like to reserve about four minutes for rebuttal, and I see I'm at about eight minutes. So Dr. Ilana's testimony, there were two components to it that should not have been excluded. First, I mean, her testimony was excluded in its entirety. But the two aspects that are really critical, she knew from firsthand experience that Carter's stepfather, Jim, was a racist and was had a deep-seated hatred towards Native Alaskans like Carter. And the judge didn't allow that to be introduced. And that would have added a very different dimension to the mitigation evidence, because it would have shown that Jim Carter's abuse of Carter was targeted because of who Carter was, not because of what he did, because of an immutable characteristic. And our society views that kind of abuse very differently than it views abuse that doesn't have that component. So what supreme court decision required admission of this testimony? Well, Eddings and Lockett are the ones that say that Dr. Ilana, Dr. Linda Ilana, her testimony should have come in because it was relevant to an aspect of the defendant's character or record. It was relevant to his character because it showed that the abuse that he suffered as a child, the abuse that he suffered as a child was racially motivated. But if the trial court said it was not relevant, how do we know that the supreme court would say that's contrary to its rulings? Again, just to be clear, with Dr. Ilana's testimony, we have a — it's essentially a two-part test, right? You have to determine whether there was error and whether the error prejudiced. As this Court has explained and the supreme court has explained, but Amado v. Gonzalez, Wiggins v. Smith, when a State court adjudicates one component of the claim, you accord it at pedeference. But if it doesn't adjudicate the second component, you review it de novo. The error component of this claim was never adjudicated. So we get de novo review on it. So the Court doesn't — this Court doesn't have to ask whether the California supreme court decision about excluding the evidence was contrary to or involved in unreasonable application of clearly established Federal law. I hope — is that clear? I understand your argument, but I thought it was excluded on relevance grounds. Right. The trial court excluded on relevance grounds. But we only have one decision that we're looking at, and that's the California supreme court decision. That's what this Court said in Curiel v. Martel. It says, like, we have lots of different decisions. That's a case where it works its way up the State system. What was the supreme court decision, the California supreme court decision on this issue? Yeah. The California supreme court said that we are not going to decide whether it was properly excluded, but we acknowledge it was a closer question. But we just think that we can deny this because of lack of prejudice. So they only addressed the harmlessness of the error. Well, if that's lack of prejudice, if they're only going to decide on lack of prejudice, then that assumes that the California supreme court would be willing to assume for purposes of this that the trial court erred. Right. So all you have to do, then, is go to the question of prejudice. I think that's — I think that is right, Your Honor. Okay. So, all right. So there's really no reason to argue about — well, you and I were discussing hearsay, but that was Jerry. Yeah. That's just Jerry. Okay. So why don't you move to the prejudice question? So the prejudice component, so I've talked about the lay testimony before. But the expert testimony was really important, too, because Nome, Alaska is like a different place, different than any other place in the United States. This is really not — but now I'm confused. So you lost me just a minute ago. Okay. Is Dr. Alana's testimony about Carter's father's racism expert testimony? No. That was lay testimony. Okay. But you just referred to expert testimony. Yes. So you lost me. Okay. Okay. So there was lay testimony. So which are you discussing now? I'm going to get to the expert testimony in a second. Okay. The expert testimony is about her firsthand experience working with Jim Carter and how he was a racist towards Native Alaskans like Dean Carter. Okay. The expert testimony would have bridged the cultural gap between Carter, a Native Alaskan who grew up in a place unlike any other place in the United States. Yeah. I want to know about the lack of prejudice. I want to know about the prejudice prong with respect to the racism of the lay testimony — Alana's lay testimony. Yes. Yes, exactly. So as I said earlier, it would have just added a different dimension and probably would have made that mitigation evidence resonate in a really deeper and different way because it was racially motivated and it showed that Carter was being targeted because of who he was and not what he did. As for the expert testimony, what she could have done is explained how Native Alaskans like Carter grow up in this place that is unique and unlike any other place in the United States. She could have explained the deep-seated problem, how the children that grow up there are just experiencing what she called widespread despair, and how people like Carter who were part Alaskan, Native Alaskan, and part white found sanctuary in no community because they were cast off by the white community and cast off by the Native Alaskan community. And she could have explained the ramifications of all of this on Carter's psychosocial development and, again, also would have been able to bridge the cultural gap, which is a consideration this Court has emphasized in cases like Mack v. Blodgett and Sierra Ponds v. Calderon. And I see that I have three minutes left. I'd like to reserve the balance of my time for rebuttal. All right. Thank you, counsel. Thank you. Andy Featherman Frazier, Deputy Attorney General, on behalf of the people. May it please the Court. Dean Carter here in the San Diego trial had the benefit of watching the L.A. trial. His attorney, one of the attorneys, was there throughout the whole proceedings and was able to evaluate that witness credibility. They had numerous investigators. In an investigation spanning four years, they interviewed expert witnesses, lay witnesses, including family members, friends, coworkers, institutional counselors, and townspeople in Rome. And he still argues it's not enough. His attorneys made the same decisions regarding how to represent him in the Los Angeles, as they had the same witnesses and same mitigating evidence. And that shows not that the San Diego counsel were deficient, but it shows that four attorneys making the decision came up with the same strategy, because there was only one story he had to tell, and the best way to tell it was the way they opted to present it for tactical reasons. Even though the Los Angeles jury rejected it, it wasn't because of defense counsel's failings. It was because the mitigation evidence, just whatever Dean Carter had, was not sufficient to overcome the egregious and sophisticated and callous crimes he committed. The counsel argues that they should have — they had two more years after the L.A. trial, and they should have investigated more about his mental impairments. Well, in the San Diego case, they did. They got a PET scan, and they made a decision after consulting with experts not to present that testimony. I thought opposing counsel said it was a matter of the defense counsel not getting the expert prepared in time. That's not consistent with the record. The defense counsel at trial stated, over a span of many pages in the record, numerous times, I am making a tactical decision. I do not want to state it based on — I do not want to state what my tactical decision is on the record, but I am making a tactical decision that I do not want to present that testimony. The trial judge stated, based on things I know that are not in the record, I agree with that strategy. What we also know is — So why? You've lived with this longer than I have, and I've struggled with that one. What was the basis for the tactical decision? There's a number of reasons. One is that there were — we do have some reports that were — that are in the record, that we're aware of, that describe Carter as a classic sociopath personality. We also know that there were — in this case, we have more information about who evaluated the defendant. He had a number of mental and medical health experts evaluate him prior to trial, including Dr. Berg, who's a psychologist, Dr. Cowell, Dr. Stoddard, who's a psychiatrist, Thomas McSpeeden, Dr. Adler, and Meredith Friedman. So there were a number of expert witnesses who had evaluated him, and defense counsel had the benefit of those reports. We also — the prosecutor also stated that had they presented this evidence, the prosecutor would have been able to use their own expert witness to evaluate Carter and present similar evidence. So given that the defense counsel had all that information, spoke with the doctor who did the PET scan for a period of time — for a period with — where the judge and the prosecutor and everyone else left, clearly it was a tactical decision. This is not a case about a lack of investigation on mental impairments. This is a case where there was a significant amount, so they — Well, this particular element, I mean, I think they were into the penalty phase when the PET scan was taken, and they had to track down the Dr. Buchbaum, who was in Europe, and they had a telephone conference, and then the judge let defense counsel talk to Dr. Buchbaum separately, and it goes on and on. And at the end, the judge seems to confirm his sense that the tactical decision is an appropriate one, and I've kind of struggled to figure out, okay, seemed like a good idea at the time, but why? If they just got the brain damage testimony or information a few days before, what's the downside of trying to proceed further down that path? A reasonable inference is the downside was that they had all these other medical reports and mental health reports that were not favorable to Carter, that they would have had to turn over and they would have had to — the prosecutor would have been able to use to their advantage. Given that the — there was a lot of information known to defense counsel, and defense counsel stated it was tactical, that's the reasonable inference. We don't have the benefit of what those reports are, but we don't need them. What we know is that defense counsel, after a thorough investigation, made a tactical decision not to present that testimony, and the court stated that she agreed with that, that it was, based on things that were known to her, that was a reasonable decision, and a tactical decision. So, based on the record, there's nothing in defense counsel specifically stating it's a tactical decision, some reasonable inferences about why it's a tactical decision. Clearly, the California Supreme Court was reasonable in determining there was not deficient performance. Regarding the evidence of chaining, I wanted to touch on that since counsel mentioned that. Of the witnesses that defense counsel was talking about that would have testified about the chaining, many of them had never seen it. These, again, are all rumors of what they had heard. So he mentioned Robert Sherman. There was no declaration from Robert Sherman that he had witnessed the chaining. There were some witnesses that stated they had seen him chained, and they all were at the Johnsons' house in the summer at a party and saw it. So it appears it was the same incident. Otherwise, the only other time is what Jerry actually testified about and what was presented. There was evidence presented that Dean Carter was chained, and Jerry explained the chaining. But the fact that there might have been one more time of chaining doesn't – and that defense counsel didn't present that doesn't result in a determination that counsel is deficient. It should also be known that one of the people who testified or that had a declaration about that other chaining event was Cheryl Stavish, and she was interviewed before trial. So a reasonable inference is that they knew about that additional event, they had discovered that witnesses, and decided not to present more evidence of that for tactical reasons. What would be the tactical reason for not presenting more evidence of abuse? Perhaps it was because they didn't want to focus too much on the abuse, or they made a determination that she wasn't as credible. That particular witness was – there's a lot of – a lot is relying post-conviction on that witness. Well, that witness was Polly Wiesner's best friend or good friend. She was Polly Wiesner's age. Polly was 8 years old when Carter was – or Carter was 8 years old when Polly was born, and Carter left when he was 9 years old. And Polly stated – Polly testified. Polly was interviewed. Polly did not testify to or acknowledge any of this abuse. So – and she stated that she doesn't remember Dean Carter ever being at their summer house, and she states that she doesn't have even much of a recollection of Dean growing up, because he was away in institutions. So a reasonable inference is that her friend wouldn't have any better recollection than she did, and it just wasn't credible testimony that she – what she witnessed or in the manner she witnessed it. Defense counsel who did a thorough investigation was in that best position to determine what – whether those witnesses were credible and how much it would add to the mitigation theme, and they could have determined that it was enough to have the one person that was in the house that knew most about it, who was Jerry Carter, testify to it. If the Court has no further questions on the ineffective assistance claim, then I will move to the other claim, which is the Eddings claim. But just to conclude on the ineffective assistance, not only did they not establish deficiency, they didn't establish prejudice, and the California Supreme Court reasonably rejected that claim. With regards to the Eddings claim, it's based on two aspects, and one is Jerry's testimony and some questions that were – a few questions that were sustained on the ground that he did not have personal knowledge. While reliable testimony can be admitted in a penalty phase, even if it's hearsay, the problem is it's not reliable if it's not based on firsthand information. Moreover, most of the instances – and I've detailed this in my brief, so I won't go through it in great detail – but most of the instances that were actually excluded by the trial court, within a question or two, Jerry actually did testify to it. The jury knew that Carter ran away. They knew he was in – gone for periods of a time. And there were some questions sustained about where he was and whether he was in a wheel well of an airplane. And I'd submit that whether he was in a wheel well of an airplane or whether he was living on the street really was not determinative to the action. Another question that was sustained was where did he get his food. Well, later in the testimony, Jerry did state that some friends would bring him food when he would run away for periods of time. The testimony was elicited that Carter ran away and was gone for long periods of time as a young child to escape his home condition. And so the evidence actually was – did come in. With regards to Dr. Elena, there are two types of testimony that was excluded. And one of them was that the – as an expert testimony about the conditions in Nome. The California Supreme Court reasonably concluded that that was cumulative to a lot of other evidence about Nome that was presented. There was no evidence that she would have testified to that wasn't testified to other people. In fact, at one point during the trial, counsel and the court discussed how much more evidence are we going to hear about Nome. I think it's not effective at this point because it's just getting repetitive. So that was cumulative. And then the other aspect of Dr. Elena's testimony was on Jim Carter, Carter's stepfather's prejudice towards Native Alaskans. And the reason the court excluded it was because Linda Elena had never seen Carter with his father. So any testimony that he was actually – treated his son worse because of his feelings towards Native Alaskans was speculative. There was no evidence to tie that in, that he made any comments or was, in fact, treated Carter that way because of his – him being Native Alaskan. And on the prejudice aspect of that, the – Carter was – his Native Alaskan heritage was because of his mother, who was half Native Alaskan. And Jim Carter married her in spite of that. So in terms of the prejudice, the fact that he married someone who was Native Alaskan and adopted her child, who was Native Alaskan, based on her having that being Native Alaskan, really wouldn't have inured to defendant's benefit because Jim Carter didn't treat him well, but there's no evidence that it was because of his status as a Native Alaskan. So as the California Supreme Court held, even if it was prejudicial to exclude her testimony in its entirety, there was no prejudice. If the Court has no further questions on that issue, then we would submit and ask to affirm the judgment. Thank you, counsel. Rebuttal. Okay. Thank you, Your Honors. Judge Bybee, I got a little bit derailed when we started talking about Jerry's testimony about the airplane, and I just wanted to complete one of my thoughts about that, and that's this. Counsel learned, both the Los Angeles and San Diego attorneys learned, that Carter took these extreme measures to escape his tumultuous home life. And that, again, goes back to the duty to dig deeper, because a child ordinarily doesn't risk life and limb by sneaking aboard a plane and sneaking away into a wheel well just to escape a single isolated incident of chaining. That should have put — And where did counsel get the evidence about sneaking in a wheel well, from Jerry? Through Jerry, yes. Yeah, but this is — you still have the same problem. Counsel is now dealing with its own hearsay. I mean, they have to decide whether or not this is reliable. Right, right. Jerry knows that he ran off. Jerry has heard that he jumped into a wheel well. Jerry doesn't know that. Right. Jerry knows that Carter returned. And, again, there were search parties that were put together, and Carter at some point was returned from Anchorage. He ended up in Anchorage as an 8- or a 9-year-old kid because he snuck aboard an airplane. And the point of this isn't to emphasize or explain our Eddings claim. It really goes back to the ineffective assistance of counsel and how trial counsel were on notice of their own investigation that there was more to find, and that further investigation would have yielded more compelling mitigation evidence. Judge Clifton, I think you are hitting the ineffective assistance of counsel claim on its head. The most troubling aspect of the claim is what they did with Dr. Buxbaum, because they knew that they needed to get a PET scan conducted, and they still waited until six days beforehand. And it's — I think the record really refutes counsel's claim that they made a tactical decision, because during that teleconference, Dr. Buxbaum said, I've only received a fax of the brain scan. I don't have any medical history. I don't have any social history. He said, I'm essentially flying blind here, and I can't render an informed opinion. So, again, putting the cart before the horse. Because the expert couldn't render an informed opinion, because of trial counsel's failures, trial counsel can't then say, well, I've made a tactical decision not to present this evidence because I don't think it's good. Trial counsel didn't know what to do. Kennedy. Well, play this out. They have a separate conversation, which obviously isn't reported, between counsel and Dr. Buxbaum, and it's after that when the Court says, you're going to go down this road, and counsel proclaims multiple times, and the multiple times may not help him because it makes it sound like he's possibly seizing onto something. But I've made a tactical decision. And a couple pages later, the Court alludes to her agreement without spelling out what the basis for that was. So what do we make of a record like that? Well, again, the Court was alluding to, I think, indications that he might have had antisocial personality disorder. And as I've explained earlier today, those prior diagnoses could have been easily refuted. I see that I'm out of time. I'd just like to end with this, which is I think that we overcome 2254D with respect to the ineffective assistance that counsel claims at penalty, both in L.A. and San Diego. But if the Court has any questions about what the record does not show, then we'd be happily — we'd happily take a remand. All right. Thank you. Thank you to both counsel for your helpful arguments. Thank you. Case number 13-99007 is submitted for decision by the Court.
judges: Rawlinson, Clifton, Bybee